UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
|  |  | PRISONER |
| JOHN ALLEN, | : | CIVIL NO. 3:02CV1818 (DJS)(TPS) |
| *Plaintiff,* | : |  |
|  | : |  |
| V. | : |  |
|  | : |  |
| JOHN J. ARMSTRONG, ET AL., | : |  |
| *Defendants*. | : | MARCH 31, 2004 |

### <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF<br>MOTION TO DISMISS</u>

The defendants, John J. Armstrong, Commissioner of Correction, et al., respectfully request that the Court grant their motion to dismiss any and all claims against them in their official and individual capacities. Plaintiff alleges in his Amended Complaint, filed February 25, 2003, that he is "a State of Hawaii prisoner, currently incarcerated within the Virginia Department of Correction … who presently resides at Red Onion State Prison. See Amended Complaint, ¶ 1. Thus, any and all claims for injunctive and/or declaratory relief are moot. <u>See Prins v. Coughlin,</u> 76 F.3d 504, 506 (2d Cir. 1996) (holding that a transfer from a prison facility renders an action for injunctive and declaratory relief against the transferring facility moot). It is axiomatic that when the relief sought can no longer be given, the demand for injunctive relief has become moot. <u>See Mawhinney v. Henderson,</u> 542 F.2d 1, 2 (2d Cir. 1976)(an actual case or controversy must exist at each stage of review... ); <u>Martin-Trigona v. Schiff,</u> 702 F.2d 380, 386 (2d Cir. 1983). For these reasons, and for the reasons discussed below, the defendants' motion to dismiss should be granted.

I.     **STANDARD OF REVIEW**

    A.     <u>A motion to dismiss may be granted at any time</u>

The Prison Litigation Reform Act (PLRA) gave the District Court several new tools to manage prison litigation and reduce its docket.  Under the new amendments to §1915, the Court has much greater authority to sua sponte dismiss inmate §1983 lawsuits.  Indeed §1915(e)(2)(B) requires that "the court <u>shall</u> <u>dismiss</u> the case <u>at any time</u> if the court determines that... the action... fails to state a claim on which relief may be granted; or seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. §   1915(e)(2)(B).  (emphasis added).  <u>See</u> <u>Atkinson v. Bohn</u>, 91 F.3d 1127, 1128-29 (8th Cir. 1996) (case dismissed for failure to state a claim pursuant to 28 U.S.C. §   1915(e) after amended complaint filed); <u>Everson v. Nelson</u>, 941 F.Supp. 1048 (D.Kan. 1996) (court denied defendant's motion for summary judgment and dismissed for failure to state a claim pursuant to 28 U.S.C. §   1915(e) a case filed in 1993).  There can be no doubt that the defendants here are immune from suit and have qualified immunity.  Therefore, the action should be dismissed in its entirety.

The Second Circuit Court of Appeals will review de novo the district court's Rule 12(b)(6) dismissal of Allen's complaint.  <u>Chance v. Armstrong</u>, 143 F.3d 698, 701 (2d Cir. 1998).  Thus, this Court is bound accept all the material allegations of the complaint and should not grant the dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, (1957).  'This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted pro se." <u>Chance</u>, 143 F.3d at 701.  Finally, when addressing

a pro se complaint, a district "court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991).

Here, plaintiff filed an Original Complaint on October 15, 2002 (Doc. #4) and then filed an Amended Complaint on February 25, 2003 (Doc. # 8).  Plaintiff has not yet served his Amended Complaint on all of the named defendants.  However, plaintiff has been allowed a chance to amend his complaint and he has so amended.  Unfortunately for plaintiff there is no amendment which can save his claims from dismissal as a matter of law, as explained below. His claims against the defendants in their official capacities must be dismissed.  Any and all claims for injunctive and/or declaratory relief are moot.  Any and all claims for damages against the defendants are barred by one or more legal defenses.  Claims against the defendants for damages in their official capacities are barred by the Eleventh Amendment.  See Will v. Michigan Dep't. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304,  105 L. Ed. 2d 45 (1989).

For the reasons discussed below, the plaintiff's money damages are barred by the eleventh amendment, and by  qualified immunity and his claim for injunctive and declaratory relief should be dismissed as moot. Importantly, all claims should be rejected as a matter of law.

## FACTS

The facts of this case are rather lengthy, as alleged from plaintiff's pro se Amended Complaint.  Some of the plaintiff's claims are barred by the statute of limitations.  In paragraph 26 plaintiff alleges he complained about events in November 1996, and in paragraph 27 he

complains about alleged events during November 1996 and January 1999. These claims are barred by the statute of limitations. See <u>Acosta v. Artuz</u>, 221 F.3d 117 (2d Cir 2000) (Court can raise statute of limitations defense sua sponte and give notice to plaintiff, so he can be heard in opposition); Constitutional torts brought under §1983 are governed in Connecticut by a three-year statute of limitations under Connecticut General Statutes § 52-577. <u>Lounsbury v. Jeffries</u>, 25 F.3d 131, 134 (2d Cir. 1994). Thus, any and all allegations of alleged misconduct prior to October 15, 1999 are barred by the statute of limitations.

Plaintiff's first allegation arising after October 15, 1999 is in paragraph 44, in which he alleges he was transferred to MCI (MacDougall Correctional Institution) on December 1, 1999. He alleges that he sought to obtain "ceremonial gemstones" consisting of a "dime size piece of turquoise and a finger tip size crystal point" (¶ 49). Allegedly defendant Cleaver forwarded this request to Deacon Keida, who in turn, forwarded the request to Father Bruno, who denied the request in a letter dated January 5, 2000. ¶50. On January 5, 2000 plaintiff alleges he made a request in writing to wear a "Native American religious liturgical headband." ¶52. On January 10, 2000 plaintiff alleges that he made a request to retain certain items in his medicine bag (which apparently was already allowed), including a "bear shape piece of pipestone-totem fetish, and a genuine black bear claw or tooth." ¶54. By letter dated January 18, 2000, then Deputy Commissioner Jack Tokarz directed plaintiff to purchase allowable items for his medicine bag in the commissary and to speak with defendant Mark Allen (no relation to plaintiff), who is the DOC Native American Chaplain.

On January 18, 2000, plaintiff went to the Admission and Processing (A & P) room at MCI to receive his stored property which had been sent from Northern CI (NCI), including four "liturgical" head bands. ¶59. Allegedly defendant Hernandez denied the plaintiff this property and directed plaintiff to dispose of his property within 30 days by mailing it out to a family member, friend or other correspondent, because it was unauthorized property. ¶60. See also A.D. 6.10. On January 22, 2000 plaintiff was placed in the Restrictive Housing Unit (RHU) and as a result all of his property was placed in storage. He claims his headbands were "confiscated." ¶63, ¶64.

On January 31, 2000 plaintiff made a request for "acquisition of a Native American Indian religious ceremonial black bear skin-totem prayer rug." ¶66.[1] On February 2, 2000, plaintiff was given his property, including his religious smudging articles but he noticed that a "large portion" of his items were missing, including his abalone seashell, feather, and sacred herbs – flat cedar, sage and sweetgrass. He refused receipt of his property. ¶70. On February 4, 2000, plaintiff received his property and noticed that his medicine bag was ripped or torn open at the top. ¶72. Plaintiff claims to have submitted requests and grievances concerned the lost or missing items, as well as the torn medicine bag. Plaintiff discovered that some of his smudging

---

[1] Perhaps plaintiff was forgetting that he was a sentenced Hawaii prisoner serving time in a high security Level 4 (MCI) and maximum security Level 5 (NCI) correctional institution. The fact that plaintiff allegedly bases his action on a denial of such items so obviously dangerous to safety and security in a prison environment like "bear claws," "finger-tip size crystals" or "bear skin rugs" makes it apparent that this action is easily dismissed on a motion to dismiss, because such items are not required by any clearly established law. Indeed, the claims are ridiculous, and the action should be dismissed as frivolous. See <u>Bettis v. Delo</u>, 14 F.3d 22 (8th Cir. 1994) (discussed, infra, at 15).

materials were missing when he received them on April 5, 2000.   ¶81.   He alleges that defendants Mahoney and Vadnais were responsible for safe keeping his smudging materials. ¶82.   He asked Chaplain Mark Allen to replace the items, but Chaplain Allen simply advised plaintiff to purchase his own supply from the commissary.   ¶84.   Plaintiff further assert that three ceremonial gemstones sent to him from the Pan American Indian Association were either lost or rejected because they were not authorized property.   Further plaintiff claims to have sought authorization for a Medicine/Peace Pipe and genuine ermine, fox or rabbit hides or skins.[2]   ¶89 For obvious security reasons, these requests were denied.   Plaintiff make various other sundry claims, none of which rise to the level of a constitutional violation.

## ARGUMENT

### I.      LOST PROPERTY CLAIMS DO NOT STATE A CAUSE UNDER §1983

Plaintiff makes a variety of claims concerning alleged lost property. None of these claims state a constitutional violation.   See Parratt v. Taylor, 451 U.S. 527, 536 (1981); Hudson v. Palmer, 468 U.S. 517 (1984).   Deprivations of property are easily addressed under Connecticut state law, simply by filing a claim for lost or confiscated property with the state Claims Commissioner.   See Conn. Gen. Stat. §4-141 et. seq.; Parratt, 451 U.S. at 543.   See Katz v. Klehammer, 902 F.2d 204, 207 (2d Cir 1990).   The complaint alleges merely that the defendants have caused random  deprivations of  plaintiff's "liturgical" property interests.   Such allegations

---

[2] Once again, plaintiff forgets that he was living in a Connecticut prison, not as a free citizen or as a free Native American on a tribal reservation.  Bettis v. Delo, 14 F.3d 22 (8th Cir. 1994), ("We also find convincing defendants' arguments that the regulations prohibiting ceremonial pipes, medicine bags, eagle claws, and altar stones in ad-seg were necessary because of increased security risks.")

are insufficient to state a Section 1983 claim because there is an  adequate state remedy  for the

deprivation.  See Parratt at 543-44; see also Crisanti v. Dumas, NO. 3:02CV1544 (RNC) 2004

U.S. Dist. LEXIS 821, (D.Conn. January 22, 2004).  In Crisanti, Judge Chatigny recently held

that "Connecticut law provides remedies for people complaining of unauthorized deprivations of

property  by state officials; they can file suit in state court or, if that is not possible, they can file

a claim with the Claims Commissioner. Conn. Gen. Stat. §4-142(2)."

Accordingly, any and all claims for compensation for lost property are to be addressed by

Connecticut state law remedies, and thus, plaintiff's claims fail to state a cognizable claim in a

§1983 action. In Crisanti, Judge Chatigny granted the defendants' motion to dismiss, and this

Court should similarly grant the motion to dismiss in this case.

## II.    PLAINTIFF'S CLAIMS ARE BARRED BY RES JUDICATA AND/OR COLLATERAL ESTOPPEL

In a civil action  captioned John Allen v. John Armstrong, et. al, 3:00CV1823(DJS)

(D.Conn. August 1, 2003) (attached), plaintiff sued, inter alia, former Commissioner John

Armstrong, and Robyn DiGenarro for allegedly denying him adequate access to court, in part,

because Ms. DiGenarro placed plaintiff on abuse of the grievance procedure in March 2000. See

Complaint in 300CV1823(DJS)(D.Conn., filed Sept. 22, 2000) (copy attached).  The exact same

allegation appears in the instant lawsuit.  Moreover, one of the claims raised by plaintiff in the

3:00CV1823 action is the claim that he filed Level 1 grievances for "return of confiscated Native

American religious ceremonial items." Ruling and Order (attached) at 3. See Complaint in

300CV1823(DJS), ¶64. In paragraph 64 of the previously dismissed complaint, plaintiff alleged

that "Plaintiff has normally and regularly received a response to submitted Inmate requests for access to Native American religious ceremonial items;…"  In paragraph 73 plaintiff alleged  that he "mailed correspondence on April 13, 2000 to Native American Rights Fund, to request legal assistance. Plaintiff's correspondence was not received by Native American Rights Fund until April 18, 2000."   Thus, plaintiff is barred by res judicata and/or collateral estoppel from relitigating those claims which were raised <u>or which could have been raised</u> in the previous action, and his claims against Ms. DiGenarro, as well as his claims about Native American religious ceremonial items must be dismissed as a matter of law.

The doctrine of res judicata serves to prevent the Plaintiff from attempting to relitigate claims raised in other lawsuits that were disposed of with a final judgment.   The doctrine of res judicata or claim preclusion states that a final and valid judgment on the merits of a claim precludes subsequent action on that claim.  The law has long been that default judgments support res judicata  as surely as judgments on the merits do. See <u>Morris v. Jones</u>, 329 U.S. 545, 550-51, 91 L. Ed. 488, 67 S. Ct. 451 (1947) ("A judgment of a court having jurisdiction of the parties and of the subject matter operates as  res judicata , in the absence of fraud or collusion, even if obtained upon a default") (quoting <u>Riehle v. Margolies</u>, 279 U.S. 218, 225, 73 L. Ed. 669, 49 S. Ct. 310 (1929)).  <u>Kampfman v. Transamerica Fin. Servs. Co</u>, 1998 U.S. App. LEXIS 22045 (2d Cir 1998).

The doctrine of res judicata prevents parties from relitigating issues in subsequent litigation that were <u>or could have been litigated in a prior action</u>.  See <u>Allen v. McCurry</u>, 449 U.S. 90, 94, 66 L. Ed. 2d 308, 101 S. Ct. 411 (1980).  The doctrine of res judicata will only apply

if "(1) the previous  action involved an adjudication on the merits; (2) the previous action the [parties] or those in privity with them; [and] (3) the  claims  asserted in  the subsequent action were, or could have been, raised in the prior action." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 284-85 (2d Cir. 2001).   Because  the plaintiff raised  in  the  previous 3:00CV1823(DJS) action, claims related to his writing requests for alleged denial of religious ceremonial items, and further, since plaintiff wrote to the Native American Rights Fund seeking help in this regard,  the plaintiff is barred from bringing this separate and distinct action where he could have and should have made a claim for this relief in the prior action.  Burka v. New York City Transit Auth., 32 F.3d 654 (2d Cir 1994)(res judicata barred claims raised in the subsequent action which arose from the same "factual grouping" as the first action).

Under the Full Faith and Credit Clause of the United States Constitution, U.S. Const. Art. IV, § 1, "federal courts must accord state court judgments the same preclusive effect as other Courts within that state." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).  One Court has reasoned, "Plaintiffs simply cannot hop from judge to judge bringing actions against different defendants out of the same transaction. Such behavior is utterly at odds with the judicial repose policy." Heritage Hills Fellowship v. Plouff, 555 F. Supp. 1290, 1297-98 (E.D. Mich. 1983).  It is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes.  See, e.g., Nemaizer v. Baker, 793 F.2d 58, 60-61 (2d Cir. 1986).

> A dismissal with prejudice has the effect of a final adjudication on the merits favorable to defendant and bars future suits brought by plaintiff upon the same cause of action. Wainwright Securities, Inc. v. Wall St. Transcript, 80 FRD 103,

105 (S.D.N.Y. 1978).  Such a dismissal constitutes a final judgment with the preclusive effect of "res judicata not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit."  <u>Heiser v. Woodruff</u>, 327 U.S. 726, 735, 90 L.Ed. 970, 66 S.Ct. 853 (1946); <u>Teltronics v. LM Ericsson Telecommunications</u>, 642 F.2d 31, 35, (2d Cir. 1981).

<u>Id</u>.    See also, <u>Hunnicutt v. Armstrong</u>, 3:03CV627 (PCD)(D.Conn. February 25, 2004)(attached).

To determine whether the plaintiff is barred from litigating the claims which were asserted in the previous proceeding, the court looks to Connecticut law.  <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790, (2d Cir. 1994).  The law is clear, on both the state and federal level, that collateral estoppel or issue preclusion "prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action."  <u>Aetna Casualty & Surety Co. v. Jones</u>, 220 Conn. 285, 296 (1991)*;* <u>Scalzo v. Danbury</u>, 224 Conn. 124, 128 (1992).  Issue preclusion applies if:

"an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment,..." 1 Restatement (Second), Judgments § 27 (1982).  An issue is "actually litigated" if it is properly raised in the pleadings, submitted for determination and in fact determined. *Id.*, 27.

<u>Scalzo,</u> 224 Conn. at 128.

The Connecticut Supreme Court has explained its rational for this doctrine:

The doctrine of collateral estoppel is "based on the public policy that a party should ***not be able to relitigate a matter which it already has had an opportunity*** to litigate."  *In re Juvenile Appeal* (83-DE). [190 Conn. 310, 316 (1983)].

<u>Jones</u>, 220 Conn at 296 (emphasis added); <u>Scalzo</u>, 224 Conn. at 127 (the doctrines of res judicata and collateral estoppel "promote judicial economy by preventing the relitigation of issues or claims previously resolved."). With res judicata, the federal courts have recognized that the full faith and credit clause has established throughout the federal system, the common-law principal that litigation once pursed to judgment shall be conclusive of rights of parties in every other court as in that where judgment was rendered. <u>Morris v. Jones</u>, 329 U.S. 545, 91 L.Ed. 488, 67 S.Ct. 451, 169 ALR 656, (1947), reh. den. 330 U.S. 854, 91 L.Ed. 1296, 67 S.Ct. 858 (1947). And that conclusiveness of judgment extends to all matters that might have been adjudicated. <u>Commonwealth ex rel. McClintock v. Kelly</u>, 287 Pa. 139, 134 A. 514 (1926).

A judgment is final "not only as to every matter which was offered to sustain the claim, but also as to ***any other admissible matter*** which might have been offered for that purpose.... The rule of claim preclusion prevents reassertion of the same claim ***regardless of what additional or different evidence or legal theories might be advanced in support of it***." <u>Delahunty v. Massachusetts Mutual Life Insurance</u>., 236 Conn. 582, 589 (1996) (emphasis added).

In addition, mutuality of parties is no longer required to successfully assert collateral estoppel. <u>Jones</u>, 220 Conn. at 302. In rejecting the mutuality requirement, the Connecticut Supreme Court explained:

> To allow a party who has fully and fairly litigated an issue prior to trial to avoid the force of a ruling against him ***simply because he later finds himself faced by a different opponent*** is simply inappropriate and unnecessary.

In light of the scarcity of judicial time and resources, the repeated litigation of ***issues that have already been conclusively resolved by a court*** carries a considerable price tag in both money and time.

Jones, 220 Conn. at 302 (emphasis added).

Because this is exactly what the plaintiff is attempting to do by bringing this present lawsuit against the present  defendants, when the issues were already litigated to decision in U.S. District Court in 3:00CV1823(DJS)(D.Conn August 1, 2003).  The  plaintiff's Complaint should be dismissed in its entirety on the ground of  res judicata and/or collateral estoppel.

## III.     **PLAINTIFF'S FIRST AMENDMENT RIGHTS WERE NOT VIOLATED**

Plaintiff argues that the denial of certain claimed "liturgical" Native American articles violates his free exercise rights under the first amendment.   When analyzing plaintiff's first amendment claims the Court should employ the reasonableness test enunciated in O'Lone v. Shabazz, supra, 482 U.S. at 352, 107 S.Ct. at 2407 wherein the Supreme Court stated that:

> We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to "substitute our judgment on ... difficult and sensitive matters of institutional administration."  Block v. Rutherford, 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984), for the determinations of those charged with the formidable task of running a prison.  Here the District Court decided that the regulations alleged to infringe constitutional rights were reasonably related to legitimate penological objectives.

Thus, under Shabazz and under Turner v. Safley, 482 U.S. 78, at 89-91 (1987), the plaintiff bears the burden of proving that the past policies and procedures prohibiting his possession of items such as a bear claw, "gemstones," turquoise,  a "peace pipe," and a bear skin rug, as well as other animal hides or furs at NCI, are not reasonably related to legitimate penological objectives.  The

plaintiff has no likelihood of success on the merits of these claims as a matter of law, and accordingly his Amended Complaint should be dismissed.

    A.    <u>The Policies And Practices Of The Defendants Reasonably Relate To Safety And Security And The Court Should Defer To The Defendants' Expertise In Matters Of Prison Administration</u>

The adverse impact that plaintiff's, "asserted right would have on other inmates, on prison personnel and on allocation of prison resources generally" is obvious. <u>Shabazz</u> at 352, 107 S.Ct. at 2406. Prison officials would have to provide "special arrangements" for a large variety of religious denominations, sects and sub-sects, for example, the American Muslim Mission, the Sunnis, the Shiites, the Five Percenters, etc. as well as numerous Christian sects, e.g. Baptists, Methodists, Lutherans, Pentacostals, Jehovah's Witnesses, etc., not to mention religious groups such as Wiccans, Santeria worshippers, and various Native American tribes, each claiming a "religious right" to possess "liturgical" articles such as multicolored prayer beads, religious shrines, statues, medallions, Native American headdresses, breast plates, and other artifacts, some of which are elaborately adorned with turquoise, animal claws or teeth, or other objects which could easily be fashioned into weapons.

In <u>Gonzalez v. Litscher</u>, 79 Fed. Appx. 215; 2003 U.S. App. LEXIS 21918 (7th Cir. 2003) the Seventh Circuit upheld the judgment for defendants rendered after the district court held a bench trial on the First Amendment claim relating to Mr. Gonzalez's desire to possess a medicine bag, ceremonial drum, smoking pipe, and feathers. Following the trial, the court concluded that Wisconsin Prison's restrictions allowing Native American inmates to possess only one religious

text and one small braid of sweet grass were reasonably related to legitimate penological interests and, therefore, constitutional.[3]

The Supreme Court has long recognized the need to defer to the judgment of prison administrators when evaluating the validity of a  prison  regulation that impinges an inmate's First Amendment rights. See, e.g.,  Procunier v. Martinez, 416 U.S. 396, 404-05, (1974). The Supreme Court noted:  "Courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . .  Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities."  Id. at 405.  In Jones v. North Carolina Prisoners Union, 433 U.S. at 125, the Court upheld  prison regulations that prohibited meetings of prisoners' labor unions, solicitations to join the union, and bulk mailings concerning the union from outside sources against a First Amendment challenge, noting that the lower court "got off on the wrong foot . . . by not giving appropriate deference to the decisions of  prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement."

Here, reading the allegations of the plaintiff's Amended Complaint, there is ample evidence of reasonable accommodations provided for the practice of Native American religion in Connecticut's prisons.  Plaintiff is allowed a medicine bag, because he complains that his was ripped or torn and needed repair.  Native American inmates have available to them a state paid

---

[3] It should be noted that the prison at issue in the Wisconsin case was classified by Wisconsin as a "supermax" and plaintiff's claims here arise out of his confinement at Northern CI, Connecticut's highest security prison, analogous to the Wisconsin prison at issue in Gonzalez v. Litscher, *supra.*

full time Chaplain, Mark Allen, who is a named defendant In this case.  Inmates may purchase smudging materials in the commissary, and are allowed to participate in daily individual smudging, even when confined at Northern CI.  See CT DOC A.D. 10.8, copy attached, and Individual Smudging Agreement attached thereto.  Chaplain Allen is being sued simply because he refused to personally pay for smudging items for plaintiff which were allegedly lost or destroyed by other prison officials.  Chaplain Allen told the plaintiff these items (Smudging materials, medicine bags, and headbands) were available for purchase in the commissary.  See attached commissary list. Plaintiff fails to state a claim against Chaplain Allen, or any other defendant.

According to A.D. 10.8, (copy attached), each major religion has one weekly service, and there are a reasonable amount of standardized approved and authorized articles available in the commissary.  Thus, there is one Catholic mass for all Catholics, whether one is Irish Catholic, Polish Catholic, Greek Orthodox, Russian Orthodox, or whatever.  Likewise, there is one Protestant service for all Christians who are Protestants.  The treatment of all groups is consistent, fair and reasonable.  Present practice does not unnecessarily drain scarce prison resources, such as available space and available staff for supervision.  See Mativn v. Henderson, 841 F.2d 31, 37 (2d Cir. 1988)(restriction on congregate services held reasonable) cert. denied 487 U.S. 220, S.Ct. 2876 (1988); see also Mativn v. Commissioner of Department of Corrections, 726 F.Supp. 42 (W.D.N.Y. 1989) (separate services for Sunni and Shia Muslims not required by First Amendment).

In <u>Bettis v. Delo</u>, 14 F.3d 22 (8th Cir. 1994), the Eight Circuit stated, "We also find convincing defendants' arguments that the regulations prohibiting ceremonial  pipes,  medicine bags, eagle claws, and altar stones in  ad-seg were necessary because of increased security risks. <u>See</u>  <u>Turner v. Safley</u>, 482 U.S. 78, 89, 96 L. Ed. 2d 64, 107 S. Ct. 2254 (1987) (" prison regulation that impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitiam penological interest"); <u>See also,</u>  <u>Mark v. Nix</u>, 983 F.2d 138, 139 (8th Cir. 1993) (per curiam)(confiscation of rosary with hard plastic crucifix did not violate religious rights). Here, the plaintiff's demand for bear claws, and finger-tip sized crystals, among other objects which could easily be fashioned into weapons, is easily rejected by this Court on a motion to dismiss, because it is abundantly obvious to anyone who has even the remotest familiarity with the operation of a maximum security prison, that such objects would reasonably jeopardize safety and security.

The plaintiff's demand for a whole host of alleged "religious articles" would reasonably jeopardize safety and security by, <u>inter</u> <u>alia</u>, draining staff resources, creating "affinity groups" that challenge institutional authority and would create a "significant ripple effect, on fellow inmates or on prison staff."  <u>Turner v. Safley, supra</u>, 482 U.S. at 90, 107 S.Ct. at 2262.  The Court should defer to the defendants' Commissioner of Correction's policy judgment and dismiss the amended complaint under 28 U.S.C.§1915(e)(2)(B)(i-iii), because it is either frivolous, fails to state a claim, and/or the defendants are immune from liability.

IV.    **QUALIFIED IMMUNITY BARS ANY AND ALL MONEY DAMAGES**

The doctrine of qualified immunity is well established. Government officials are protected from suits against them in their individual capacity for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727(1982).  A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). Where a right is clearly established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." In re State Police Litig., 88 F.3d 111, 123 (2d Cir. 1996).  In this regard it was impossible for defendants to foresee that security decisions based on safety and security concerns for contraband and weapons, found constitutional by other courts, e.g. Bettis v. Delo, supra, decisions, which are quintessentially discretionary based on years of experience and professional correctional judgment, when taken within the clear exercise of that professional judgment, would expose the defendants to personal money damages simply because the prisoner plaintiff disagreed with the selected course of religious accommodation chosen by the correctional professionals.

The chronic difficulty with qualified immunity analysis for courts is in accurately defining the right at issue.  An overly narrow definition of the right can effectively insulate the government's actions by making it easy to assert that the narrowly defined right was not clearly

established.  On the other hand, as the Supreme Court noted in <u>Anderson</u>, if the right is defined too broadly, "plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  <u>Anderson</u>, 483 U.S. at 639.

In <u>Labounty v. Coughlin</u>, 137 F.3d 68 (2nd Cir, 1998) the Second Circuit warned as follows:

> [I]f the right is defined too broadly, "plaintiffs would be able to convert the rule of qualified immunity that our  cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." <u>Anderson</u>, 483 U.S. at 639. <u>Labounty</u> at 73-74

This is precisely what the plaintiff does in this case.  Painting with too broad a brush, and alleging conditions by using rhetorical and extreme language, plaintiff alleges in conclusory fashion that he was subjected to denial of his first amendment right to possess certain claimed religious objects.  However, there is not one case which clearly holds that there is a constitutional right to bear claws, finger tip size crystals, fox, ermine or rabbit skins or a bear skin rug.  Such claims for such alleged "liturgical" items, are completely novel, and indeed, not "clearly established" constitutional rights.  <u>Rodriguez v. Phillips,</u> 66 F.3d 470, 475 (2d Cir. 1995).

Since qualified immunity is intended to protect government officials from the harassing and expensive burdens of litigation as well as the threat of monetary damages, courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by qualified immunity.  <u>See</u> <u>Cartier v. Lussier</u>, 955 F.2d 841, 844

(2d Cir. 1992); See also Harlow, 457 U.S. at 818.  Summary judgment is particularly appropriate when the qualified immunity defense is based on a showing that an asserted right was not clearly established since the inquiry as to whether a right was or was not clearly established is "solely a question of law," Weaver, 40 F.3d at 533.

Here, the PLRA gives the Court another procedural tool to dismiss an action where, as here, the defendants are entitled to qualified immunity.   See 28 U.S.C.§1915(e)(2)(B)(iii). Defendants are entitled to dismissal on qualified immunity grounds even if plaintiff's federal rights and the defendant official's permissible actions were clearly delineated at the time of the action complained of, because it was nonetheless "objectively reasonable" for the defendant official "to believe that his acts did not violate those rights."  Robison v. Via, 821 F.2d 913, 921 (2d Cir. 1987).  Here, it is objectively reasonable to conclude that items such as bear claws, "gemstones," turquoise pieces, "pipestone totem," animal skins or hides, and bear skin rugs could be used as weapons, or to arm an inmate with defensive shields to fight another inmate or staff.  The prohibition on these contraband items is easily related to reducing contraband which could be used as weapons in prison.  Defendants would have no way of knowing that by denying such items they were violating plaintiff's clearly established constitutional rights, especially where there is no Second Circuit case which clearly establishes the right to possess such items. Accordingly the plaintiff's claims for money damages are barred by qualified immunity and must be dismissed under 28 U.S.C.§1915(e)(2)(B)(iii).

V.     **PLAINTIFF'S CLAIMS FOR DAMAGES ARE BARRED BY**
       **42 U.S.C. §1997e(e)**

Under  §1997e(e), "no Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."   The "'physical injury' required by §1997e(e) 'must be more than de minimus [sic], but need not be significant.'"   Harper v. Showers, 174 F.3d 716, 719 (5th Cir. 1999) (quoting  Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)) (alteration in original).  (dismissing a prisoner's section 1983 action on the basis that a bruised ear lasting for three days was de minimis and could not serve as the requisite physical injury needed for a claim for emotional suffering);  Wright v. Miller, 973 F. Supp. 390, 396 (S.D.N.Y. 1997)  (holding that prisoners could not recover damages for mental anguish under the PLRA).  See Cox v. Malone, 199 F. Supp. 2d 135 (S.D.N.Y. 2002) aff'd 56 Fed. App'x. 43, 2003 U.S. App. LEXIS 3008 (2d Cir. 2003)(citing Siglar with approval, and noting that §1997e(e) was intended to deter frivolous prisoner lawsuits seeking damages).

In this action, plaintiff does not allege any physical injury whatsoever.  In Jones v. H.H.C. Inc., 2003 U.S. Dist. LEXIS 6510 (S.D.N.Y. 2003) the Southern District Court of New York noted that courts have strictly construed the physical injury requirement of §1997e(e), barring claims by prisoners who demonstrate solely emotional or mental injury and barring physical injury  claims where the injury alleged is de minimis.   Porter v. Coombe, 1999 U.S. Dist. LEXIS 11924, 1999 WL 587896, at *2 (S.D.N.Y. Aug. 4, 1999).

In <u>Jones</u>, a Muslim inmate alleged that he had been served pork in violation of his first amendment right to a diet consistent with his Muslim religion.  He further alleged that the pork caused him to suffer from high blood pressure.  The court rejected the high blood pressure claim, and reasoned  that high blood pressure fails to state a cognizable claim for physical injury.  Instead, the court  in <u>Jones</u> recognized that  although Jones claimed that he had suffered psychological damage, and that the porcine Heparin elevated his blood pressure, these consequences of the defendants' conduct, even if established, <u>are clearly insufficient to meet the</u> <u>" physical injury" threshold</u>.  <u>See</u> <u>Alonzo v. Squyres</u>, 2002 U.S. Dist. LEXIS 14935, 2002 WL 1880736 (N.D. Cal. Aug. 9, 2002)(emphasis added)(plaintiff taken to hospital for high blood pressure, brought on by "gruesome psychological harassment[]," has not suffered a prior physical injury). Cf. <u>Pinkston-Bey v. DeTella</u>, 1997 U.S. Dist. LEXIS 3969, 1997 WL 158343, at *3 (N.D. Ill. Mar. 31, 1997)(severe headaches are not  physical injury).

The physical injury requirement of the PLRA applies to prisoner civil rights actions claiming violations of first amendment free exercise of religion.  <u>See</u> <u>Searles v. Van Bebber</u>, 251 F.3d 869 (10th Cir. 2001).  In <u>Searles</u>, the prisoner plaintiff sued several prison officials alleging they had violated his first amendment right to free exercise of religion by denying him approval for a kosher diet.  The defendant prison chaplain appealed  from a jury verdict against him for compensatory damages of $ 3,650, as well as $ 42,500 in punitive damages.  The chaplain contended that the jury award of compensatory damages was required by law to be vacated because the jurors found no physical injury, only "mental and emotional injuries" and such recovery in the absence of physical injury was barred by the Prison Litigation Reform Act of

1996, 42 U.S.C.S. § 1997e(e).  The Tenth Circuit Court of Appeals held that §1997e(e) rendered invalid the award of compensatory damages, due to lack of proof of physical injury, and that the punitive damages was also invalid because the jury was instructed to consider the amount of the flawed compensatory damages award in determining the amount of punitive damages.  See also Allah v. Hafeez, 226 F.3d 247 (3rd Cir. 2000)(compensatory damages may not be awarded in a first amendment free exercise case where there is no physical injury). Because the plaintiff Allen in this case alleges no physical injury, and further because he seeks significant compensatory damage awards in amounts ranging from $5,000 to $25,000 from each defendant, §1997e(e) provides a statutory bar to any award of such compensatory damages, and the defendants' motion to dismiss should be granted for this additional reason.

## VI.    PLAINTIFF FAILED TO FULLY EXHAUST BEFORE BRINGING THIS ACTION

In various paragraphs of plaintiff's amended complaint he refers to his filing a level one grievance, citing to an "I.G.P." (inmate Grievance Procedure) number, but he attaches no grievance form to his complaint.  Plaintiff does not allege that he filed a level two grievance, and if unsatisfied with level two, a level three grievance.  Complete exhaustion of all levels of the grievance procedure is required prior to bringing a §1983 action in federal court.

Under the exhaustion requirements of the PLRA no action may be brought until all remedies which are available have been fully exhausted.  To begin, the plain language of § 1997e(a), providing that 'no action shall be brought . . . until such administrative remedies as are available are exhausted," requires that exhaustion prior to commencement of a § 1983 action is

mandated.  See Porter v. Nussle, 534 U.S. 516, 524 (2002); See also Neal v. Goord, 267 F.3d 116, 122 (2d Cir. 2001)  (holding that an inmate may not avoid the requirements of  42 U.S.C. § 1997e(a) by exhausting administrative remedies after filing a civil rights action in federal court). Where exhaustion is required, failure to do so must result in dismissal, notwithstanding efforts by the inmate-plaintiff to pursue administrative remedies while simultaneously seeking relief in federal court.  Neal, 267 F.3d at 117-118.

This District Court has held that any attempt to complete the exhaustion process after the commencement of the prisoner action requires that the action be dismissed, See, e.g.  Ziemba v. Clark, 3:02CV1609(AWT) (DFM), 2003 U.S. Dist. LEXIS 22117 (D.Conn. Dec. 4, 2003); Harris v. Conn. Dep't of Corr., No. 3:02cv706(AWT), 2003 U.S. Dist. LEXIS 16642(D.Conn. September 15, 2003).  Thus, any attempt to exhaust administrative  remedies after the case was filed  is  ineffective  to  satisfy  the  exhaustion  requirement.   In  addition,  "prison  officials  are entitled to require strict compliance with an existing grievance procedure."  Hemphill v. New York, 198 F. Supp. 2d 546, 549 (S. D.N.Y. 2002).

Here, plaintiff  has  simply  failed  to  comply  with  the  Connecticut  DOC's  grievance procedure set forth in Administrative Directive 9.6,  www.doc.state.ct.us/ad/ch9.  Paragraph 15 of A.D. 9.6 provides that the reviewer of a grievance has 30 days to provide a response in writing to the inmate.  Paragraph 16 of A.D. 9.6 provides that an inmate may appeal a Level 1 grievance to Level 2, by filing an appeal within 5 days of receiving the Level 1 response.  The response to a Level 2 grievance shall be made in writing within 30 days after receipt of the Level 2 grievance. It is not alleged by plaintiff that he completed the various levels of the grievance procedure prior

to filing suit.  There is no allegation that plaintiff appealed any level one response to Level 2 as is required by §1997e(a) prior to commencing this action.   Instead, plaintiff alleges that his frequent grievances resulted in his grievance privileges being suspended for abuse of the grievance directive, and as a result he sues defendant DiGennaro.  Unfortunately for plaintiff, futility is not an exception to the exhaustion requirement of the PLRA.  See Booth v. Churner, 532 U.S. 731, 734-35, 741, & n. 6 (2001); (stating that "we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise").  Moreover, this precise claim against Ms. DiGennaro was raised in the prior action Allen v. Armstrong, 3:00CV1823(DJS) (D.Conn. August 1, 2003), and Ms. DiGennaro won a judgment in her favor when the case was dismissed.  See Ruling at 16-17 (attached).  Such dismissal acts as a res judicata bar, as discussed in Section of this brief.

"An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance."  Arce v. Keane,  01 Civ. 2648 (BSJ), 2004 U.S. Dist. LEXIS 3698 (S.D.N.Y. March 9, 2004).  As noted by the district court in Arce v. Keane, "Among other reasons, Congress enacted § 1997e(a) to give prison officials an opportunity to take corrective actions that might obviate the need for litigation and to assure that adjudication by federal courts would be facilitated by an administrative record that clarifies the contours of a controversy.  See Porter, 534 U.S. at 524-25; Booth v. Churner,  532 U.S. at 737."  Allowing an inmate to opt out of the Connecticut DOC's grievance scheme as set forth in A.D. 9.6 without filing even one appeal  and before receiving any response or after receiving an unsatisfactory level 1 response, without an appeal to higher prison authorities would undermine these goals.   It is unreasonable

to read A.D. 9.6 as providing that a federal action is the next and only recourse when the prison

fails to respond  or responds in an allegedly unresponsive fashion to an initial grievance.  See

Arce v. Keane, supra.; see also Ziemba v. Clark, 3:02CV1609(AWT) (DFM), 2003 U.S. Dist.

LEXIS 22117 (D.Conn. Dec. 4, 2003).  In Hock v. Thibideau, 245 F. Supp. 2d 451 (D.Conn.

2003), Judge Goettel concluded that plaintiff must exhaust all available administrative

procedures as set forth in the Administrative Directive 9.6  prior to filing suit in Federal Court.

citing Booth, 532 U.S. at 736.  Id. 245  F. Supp. 2d at 456. Judge Goettel rejected the claim that

participating in an investigation or writing letters of complaint to the Commissioner satisfied the

exhaustion requirement stating, "Significantly, the Directives do not provide that exhaustion may

occur through merely an inmate's direct, voluntary participating in a DOC investigation, or by

voluntarily providing additional information to the DOC beyond that initially sought in its

investigation. See Directive 9.6. Consequently, such inmate actions, coupled with the DOC's

responsive actions, cannot be a means to satisfy the exhaustion requirement.  See  Booth, 532

U.S. at 736;     Calca, 2001 U.S. Dist. LEXIS 3401, 2001 WL 256170, at *4; Directive 9.6."

Hock v. Thibedeau, at 456.  Judge Goettel concluded that no futility exception may be read into

A.D. 9.6. Id at 458.   Because plaintiff has failed to exhaust his administrative remedies, and

further because there is no futility exception allowed by law, the plaintiff's amended complaint

should be dismissed in its entirety for these additional reasons.

## VII. PLAINTIFF'S CLAIMS UNDER RLUIPA ARE BARRED BY SOVEREIGN IMMUNITY, AS WELL AS QUALIFIED IMMUNITY, AND ARE MOOT

### A. RLUIPA Does Not Create A Cause of Action for Money Damages

The plaintiff alleges, in part, in his Second Cause of Action that his rights under RLUIPA have been violated. This federal statute presents novel and complex legal issues which requires a compelling state interest to justify a substantial burden on an institutionalized person's religious exercise. See McEachin v. McGuinness, 357 F.3d 197 (2d Cir. 2004)(noting that RLUIPA may present complex legal issues), citing to Cutter v. Wilkinson, 349 F.3d 257 (6th Cir. 2003)(holding that RLUIPA violates the Establishment Clause). RLUIPA creates a private right of action. Any person may "assert a violation of this chapter as a claim or defense in a judicial proceeding" and may obtain "appropriate relief against a government." 42 U.S.C. §2000cc-2(a). The United States may also seek injunctive or declaratory relief to enforce the statute. 42 U.S.C. § 2000cc-2(f). Subsection (a) of 2000cc-2, states:

Judicial relief

(a) Cause of action. A person may assert a violation of this Act as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution. (emphasis added)

The plain text of the statute does not create a cause of action for money damages against individuals in their individual capacities, but rather, appears to allow for only injunctive relief against a government. It is well established that the Eleventh Amendment and sovereign immunity bar monetary relief against a state government, agency, or state official in their official

capacity.  See  Will v. Michigan Dep't. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304,  105 L. Ed. 2d 45 (1989).  Thus, the only "appropriate relief" which may be awarded against a government is prospective injunctive relief to remedy an ongoing constitutional violation. Because the plaintiff is a Hawaii prisoner, and is presently incarcerated in Red Onion State Prison in Virginia, there is no "appropriate relief" which may be awarded to plaintiff under RLUIPA since his transfer has rendered such injunctive relief moot.  See Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996) (holding that a transfer from a prison facility renders an action for injunctive and declaratory relief against the transferring facility moot).

Here plaintiff is not suing a "government" nor has he named a "government" as a defendant.  For example, under analogous circumstances involving, e.g., the Privacy Act (5 USCS § 552a) which authorizes private civil actions for violations of its provisions only against agency, and not against any individual, a petition which names only individual defendants is properly dismissed.    Brown-Bey v United States.720 F2d 467. ( 7th Cir.1983).  When Congress wishes to create a cause of action for damages, it knows how to do so by expressly using clear terms and conditions in a statute authorizing a monetary damage remedy.  Compare RLUIPA with, e.g. 7 USCS §2357  (2004).

§ 2357.  Unauthorized practice, …shall be liable in a  **civil action**  for the return of all money received, and **for compensation for  damage**  done by such person and also may be enjoined from such practice. However, there shall be no liability for damage if such person establishes that the work was done competently and without negligence. This section does not apply to anyone who, without a claim of self-sufficiency, works under the supervision of another who stands admitted and is the responsible party; nor to anyone who establishes that the person acted only on behalf of any employer by whom the person was regularly employed. (emphasis added).

There are numerous other statutes which expressly create a cause of action for damages.[4]  For

example, in Title VII, employment discrimination cases, federal law provides as follows:

§ 1981a.  Damages in cases of intentional discrimination in employment

(a) Right of recovery.
(1) Civil rights.  In an action brought by a complaining party under section  706 or
717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5 [or 2000e-16]) against a
respondent who engaged in unlawful intentional discrimination (not an
employment practice that is unlawful because of its disparate impact) prohibited
under section 703, 704, or 717 of the Act  (42 U.S.C. 2000e-2 or 2000e-3 [or
2000e-16]), and provided that the complaining  party cannot recover under section
1977 of the Revised Statutes (42 U.S.C. § 1981), **the complaining party may
recover compensatory and punitive damages** as allowed in subsection (b), in
addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964
[42 USCS § 2000e-5(g)], from the respondent. (**emphasis added**).

There is no similar language in RLUIPA which authorizes an award of damages.   To the

contrary, only "appropriate relief against a government" is authorized.   Defendants respectfully

suggest that phrase, due to sovereign immunity and eleventh amendment prohibitions against

monetary relief, should only be construed to mean limited injunctive relief to remove substantial

---

[4]    See e.g. 12 USCS § 1787  (2004)  Payment of insurance (h) Liability of directors and officers.
A director or officer of an insured credit union **may be held personally liable for monetary
damages in any civil action**  by, on behalf of, or at the request or direction of the Board,…
(emphasis added)

See also, e.g. 12 USCS §1821  (2004)(k) Liability of directors and officers.  A director or officer
of an insured depository institution **may be held personally liable for monetary  damages  in
any  civil action…see also e.g.** 16 USCS § 1443  (2004)  (c)  Civil actions  for response costs
and  damages.  (1) The Attorney General, upon request of the Secretary, may commence a civil
action  against any person or vessel who may be liable under subsection  (a) for response costs
and damages.

burdens on religious exercise which are not justified by compelling state interests.  There is no need for such injunctive relief in this case where the plaintiff is a Hawaii inmate incarcerated in Virginia, and his claims for injunctive relief are moot.

As in all statutory construction  cases, we begin with the language of the statute.  The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute  in the case."  <u>Robinson v. Shell Oil Co</u>., 519 U.S. 337, 340, (1997).  Plaintiff seems to infer that RLUIPA authorizes a civil action for damages, even though Congress expressly omitted any language concerning "damages" from RLUIPA.

The Court should not infer as much, as it is a general principle of  statutory construction that when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  <u>Russello v. United States</u>, 464 U.S. 16, 23, 7 (1983); <u>Keene Corp. v. United States</u>, 508 U.S. 200, 208, (1993) ("Where Congress includes particular language in one section of a statute but  omits  it in another. . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (internal quotation marks and citation omitted).  Thus, here, where Congress expressly included in a number of federal statutes an express remedy of a civil action for money damages, but carefully crafted the language in RLUIPA to limit the remedy to "appropriate relief against a government," it is reasonable to conclude that Congress did not intend RLUIPA to give rise to a cause of action for money damages, because such language has been expressly excluded.

RLUIPA also expressly provides in subsection (e) with regard to prisoners,

(e) Prisoners.  Nothing in this Act shall be construed to amend or repeal the Prison Litigation Reform Act of 1995 (including provisions of law amended by that Act).

Thus, the provisions of RLUIPA are to be read consistent with the limitations on injunctive relief under the PLRA which limits the availability of injunctive relief to those situations where such injunctive relief is necessary to remedy an on going constitutional violation.  See 18 U.S.C. §3626.[5]  Moreover, as noted above there is a vast contrast between RLUIPA and those statutes which create private causes of action for damages.

RLUIPA is codified and appears in the United States Code in the section for actions for preventive relief, not monetary relief.

§ 2000a-3.  Civil actions  for preventive relief

… Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 203 [42 USCS § 2000a-2], a civil action for preventive relief, including an application for a permanent or temporary injunction restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if he certifies that the case is of general public importance.

B.     There Is A Split of Authority as to RLUIPA's Constitutionality, and Thus, Where the Law is Unclear, Defendants Have Qualified Immunity

As noted above, RLUIPA does not create a cause of action for money damages.

However, even if the Court were to disagree, then, nevertheless, the defendants are entitled to

---

[5] The  PLRA prohibits intrusive injunctive relief and requires the termination of  consent decrees, upon a motion for termination under 18 U.S.C. § 3626 (b), unless findings are made that prospective relief remains necessary to correct ongoing violations of a federal right and that the relief is narrowly drawn and the least intrusive means to correct the violation.  See  18 U.S.C. § 3626 (b)(3).  See Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

qualified immunity, especially here, where the law is unclear as to RLUIPA.  As discussed above, in section IV at 17-19, qualified immunity applies where the law is unclear.  Because there is a split of authority as to the constitutionality of RLUIPA, the law is unclear.  See Cutter v. Wilkinson, 349 F.3d 257 (6th Cir. 2003)(holding that RLUIPA violates the Establishment Clause); but see Charles v. Verhagen, 348 F.3d 601 (7th Cir 2003)(holding the opposite that RLUIPA does not violate the establishment clause); Madison v. Riter, 355 F.3d 310 (4th Cir. 2003)(reversing the District Court which found establishment clause violation).  In Cutter at 264, the Sixth Circuit noted that the cases which find that RLUIPA violates the Establishment Clause are more persuasive.  See Ghashiyah v. Dep't. of Corr. Of Wisconsin, 250 F. Supp. 2d 1016, 1025-26 (E.D. Wis. 2003) (collecting authorities that have used various factors in Establishment Clause cases).  Applying these factors to the Cutter case demonstrated to the Sixth Circuit that RLUIPA has the effect of impermissibly advancing religion by giving greater protection to religious rights than to other constitutionally protected rights.     Madison v. Riter, 240 F. Supp. 2d 566 (W.D. Va. 2003), rev'd 355 F.3d 310 (4th Cir. 2003).

The Second Circuit has not yet weighed in on the merits of RLUIPA.  However, in an earlier case involving the now declared unconstitutional RFRA, Judge Cabranes in Jolly v. Coughlin, 76 F.3d 468 (2d Cir 1996) the Second Circuit noted that violations of first amendment religious rights cannot be compensated for monetarily, adding weight to the defendants' claim that RLUIPA does not authorize monetary damages.  Jolly v. Coughlin at 475-476. Importantly, Judge Cabranes, writing for the Second Circuit, noted that even under the compelling interest test of RFRA, the Court should nevertheless defer to prison officials on matters of prison

administration and security.  The <u>Jolly</u> Court, cited to a long line of Supreme Court cases, as well

as the remarks of the Senate sponsors in the legislative history of RFRA to conclude, that the test

under RFRA was not much different than the test under <u>Turner</u>, and required courts to defer to

the experience and judgment of prison administrators when applying the compelling interest test.

The <u>Jolly</u> Court at 475-476 stated:

> Even prior to <u>O'Lone</u>, courts accorded prison officials substantial deference in
> establishing appropriate regulations to maintain security and discipline within
> correctional facilities.  See, e.g., <u>Pell v. Procunier</u>, 417 U.S. 817, 822, 41 L. Ed.
> 2d 495, 94 S. Ct. 2800 (1974) ("Challenges to prison restrictions that are asserted
> to inhibit First Amendment interests must be analyzed in terms of the legitimate
> policies and goals of the corrections system. . . .");   <u>Procunier v. Martinez</u>, 416
> U.S. 396, 409-10, 412, 40 L. Ed. 2d 224, 94 S. Ct. 1800 (1974) (noting that First
> Amendment guarantees must be applied in light of the special characteristics of
> the relevant environment; recognizing need to balance inmates' First Amendment
> rights against governmental interests in security and discipline), overruled on
> other grounds by <u>Thornburgh v. Abbott</u>, 490 U.S. 401,  104 L. Ed. 2d 459, 109 S.
> Ct. 1874(1989); see also  <u>Block v. Rutherford</u>, 468 U.S. 576, 583-85, 82 L. Ed. 2d
> 438, 104 S. Ct. 3227 (1984) (examining constitutional protections for pretrial
> detainees in light of deference to be accorded to judgment of correctional
> officials);   <u>Bell v. Wolfish</u>, 441 U.S. 520, 547, 60 L. Ed. 2d 447, 99 S. Ct. 1861
> (1979) ("Prison administrators . . . should be accorded wide-ranging deference in
> the adoption and execution of policies and practices that in their judgment are
> needed to preserve internal order and discipline and to maintain institutional
> security.").   We must therefore conduct our inquiry in this case against the
> backdrop of prior decisions recognizing that courts are ill-equipped to substitute
> their judgments on matters of prison administration for those of prison authorities.
> See  S. REP. NO. 111, at 9-10, 1993 U.S.C.C.A.N. at 1898-1900 ("[The
> compelling interest test] should be interpreted with regard to the relevant
> circumstances in each case. . . . The committee expects that courts will continue
> the tradition of giving due deference to the experience and expertise of prison and
> jail administrators in establishing necessary regulations and procedures to
> maintain good order, security and discipline, consistent with consideration of
> costs and limited resources."); See also <u>Hamilton</u>, 72 F.3d at [WL * 7- * 8];
> <u>Werner</u>, 49 F.3d at 1479-80.

Thus, even if RLUIPA were constitutional, and even if it were to apply here, the defendants' nevertheless acted to implement rules for the safety, security and order of the institution, and are entitled to qualified immunity.  They cannot be held liable for not anticipating changes in the law, which were not implemented until September 22, 2000.  Many of the events alleged in this complaint occurred **prior** to that date.

RLUIPA is now codified at § 2000cc-1 and is entitled "Protection of religious exercise of institutionalized persons."  A history of the Act however reveals that it was enacted September 22, 2000, as part of  P.L. 106-274, § 3, 114 Stat. 804.  Thus, almost every single act complained of in this action occurred prior to the enactment of RLUIPA, and defendants were unaware of the requirements of RLUIPA when they responded to plaintiff's requests.  Accordingly RLUIPA does not apply to this case, and even if it does, defendants are entitled to qualified immunity.


## VIII.  THE COURT SHOULD EITHER ABSTAIN FROM OR DISMISS PLAINTIFF'S STATE LAW CLAIMS

### A.    Sovereign Immunity Bars Plaintiff's Action

Just as RLUIPA does not provide for money damages, neither does Conn. Gen. Stat. §52-571b.  The language of 571b does not expressly waive the state's sovereign immunity, as is required in order to bring a cause of action for money damages.  The General Assembly, by appropriate legislation, can waive the state's sovereign immunity from suit and authorize suits against the state.  Lacasse v. Burns, 214 Conn. 464, 468, 572 A.2d 357 (1990).  One example of

such a situation is the defective highway legislation.  Lacasse, supra.[6]  There are other state

statutes which also waive sovereign immunity and directly authorize a suit against the state or a

Commissioner.[7]

Since a state can only act through its officers and agents, a suit against a state official

concerning a matter in which the official represents the state is, in effect, a suit against the

sovereign state.  Fetterman v. University of Connecticut, 192 Conn. 539, 550-551, 473 A.2d

---

[6] §4-61.  Actions against the state on highway and public works contracts.  Arbitration…..Such
action shall be tried to the court without a jury.  All legal defenses except governmental
immunity shall be reserved to the state.

[7] Conn. Gen. Stat. § 19a-24 (2003)

§ 19a-24.  (Formerly Sec. 19-5a).  Claims for damages against Commissioners of Public Health
and Mental Retardation and certain officials, employees…  (a) Any claim for damages in excess
of seven thousand five hundred dollars on account of any official act or omission of the
Commissioner of Public Health or the Commissioner of Mental Retardation or any member of
their staffs, any member of the Council on Tuberculosis Control, Hospital Care and the Council
on Mental Retardation or either of the boards of trustees of the state training schools or any
member of any regional advisory and planning council or any superintendent, director, employee
or staff member of any chronic disease hospital or state training school or state mental
retardation region shall be brought as a civil action against the commissioners in their official
capacities and said commissioners shall be represented therein by the Attorney General in the
manner provided in chapter 35.  Damages recovered in such action shall be a proper charge
against the General Fund of the state and shall be paid in the manner provided in section 3-117.
Any such claim for damages not in excess of seven thousand five hundred dollars shall be
presented to the Claims Commissioner in accordance with chapter 53 if such claim is otherwise
cognizable by the Claims Commissioner.

Duguay v. Hopkins, 191 Conn. 222, 227, 464 A.2d 45 (1983).

§19a-24  was intended by the legislature to apply to apply to all civil action against the
commissioner of mental retardation or any member of their staffs.  By its enactment the
legislature has waived sovereign immunity of the state in those cases to which the statute
applies.  Duguay v. Hopkins, supra, p. 232 (Emphasis added.)

1176 (1984); Horton v. Meskill, 172 Conn. 615, 376 A.2d 359 (1977).  With regard to the state, it is a long recognized principle of law that the state cannot be sued without its consent. Fetterman, supra, at 550.  The state is immune regardless of the nature of the allegations.  Hanna v. Capitol Region Mental Health, 74 Conn. App. 264, 270 n. 7, 812 A.2d 95 (2002).  The plaintiff has not, and cannot, allege consent.  Accordingly, this case must be dismissed as to the state.

Also, in their official capacities, the question is whether defendants are immune from suit and liability under the doctrine of sovereign immunity.  Hultman v. Blumenthal, 67 Conn. App. 613, 621, 787 A.2d 613 (2002).  States and state officials sued for engaging in official acts are immune from suit.  Will v. Michigan State Dep't. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); Krozser v. New Haven, 212 Conn. 415, 521, 562 A.2d 1080 (1989), cert. denied, 493 U.S. 1036 (1990); Doe v. Heintz, 204 Conn. 17, 31, 526 A.2d 1318 (1987); Fetterman v. University of Connecticut, supra, at 550; State v. Chapman, 176 Conn. 362, 365, 407 A.2d 787 (1978).

This absolute bar is modified by decisions which hold that sovereign immunity does not bar actions against state officials who acted in excess of statutory authority or pursuant to an unconstitutional statute.  Shay v. Rossi, 253 Conn. 134, 169, 749 A.2d 1147 (2000); Antinerella v. Rioux, 229 Conn. 479, 489, 642 A.2d 699 (1994).  In such circumstance, the doctrine does not apply because the employee is not carrying out government policy.  Antinerella, supra, at 497. This exception does not apply to cases, such as the instant case, where money damages are

sought.  Miller v. Egan, 265 Conn. 301, 325 (2003); Prigge v. Ragaglia, 265 Conn. 338, 349 (2003).

In fact, Conn. Gen. Stat. §52-571b neither waives sovereign immunity nor creates a private cause of action for money damages.  Instead, in language remarkably similar to RLUIPA, Conn. Gen. Stat. §52-571b only authorizes only "appropriate relief against the state or any political subdivision of the state."  Conn. Gen. Stat. §52-571b(c).  Such "appropriate relief" can only mean injunctive relief, not money damages.  Thus, where the legislature has expressly created in other statutes a statutory cause of action for damages, but omitted such language here in §52-571b, then there is no statutory remedy for damages available to plaintiff.  See e.g. Conn. Gen. Stat. §§ 52-570b(g)(expressly waiving the defense of governmental immunity); §52-570c(b)(expressly creating a civil action to recover "actual damages"); §52-570d(c)(authorizing an action to recover "damages"); §52-570e ("may bring an action for damages");§52-571a (allows for "recovery of damages"); and §52-571c(allows for an award of "treble damages" for intimidation based on bigotry). Conn. Gen. Stat. 52-571b, only authorizes "appropriate relief" and since money damages against the state are barred by sovereign immunity, such "appropriate relief" is limited to an injunction to remove the alleged burden on religion.  Since plaintiff is a Hawaii prisoner incarcerated at Red Onion State Prison in Virginia, such injunctive relief is unnecessary, and is indeed moot.

B.      The Individual Defendants Are Immune From Suit And Liability In Their
        Individual Capacities Under Conn. Gen. Stat. § 4-165

        The plaintiff appears to sue the defendants in their individual capacities.   Assuming,

arguendo, that sovereign immunity is not a bar to this action, it is then appropriate to examine

whether the statutory immunity conferred by Conn. Gen. Stat. § 4-165 applies.  Shay v. Rossi,

supra, at 162.  The statute provides, in pertinent part, as follows:

> No state officer or employee shall be personally liable for damages or injury, not
> wanton, reckless or malicious, caused in the discharge of his duties or within the
> scope of his employment.  Any person having a complaint for such damage or
> injury shall present it as a claim against the state under the provisions of this
> chapter.

Conn. Gen. Stat. § 4-165.   Plaintiff has not alleged that the defendants acted wantonly or

maliciously or outside the discharge of their duties or scope of employment.   Consequently, the

case is barred by Conn. Gen. Stat. § 4-165.  See State v. Sullivan, 189 Conn. 550, 551-52, 457

A.2d 304 (1983); Tucker v. White, 33 Conn. Supp. 546, 359 A.2d 190 (1976).

        Nor does the information that is alleged constitute immunity-avoiding conduct.  The test

for determining whether conduct is wanton, reckless or malicious is stated as follows:

> In order to establish that the defendants' conduct was wanton, reckless, willful,
> intentional and malicious, the plaintiff must prove, on the part of the defendants,
> the existence of a state of consciousness with reference to the consequences of
> one's acts...[Such conduct] is more than negligence, more than gross
> negligence...[I]n order to infer it, there must be something more than a failure to
> exercise a reasonable degree of watchfulness to avoid danger to others or to take
> reasonable precautions to avoid injury to them...It is such conduct as indicates a
> reckless disregard of the just rights or safety of others or of the consequences of
> the action...[In sum, such] conduct involving an extreme departure from ordinary
> care, in a situation where a high degree of danger is apparent...[Dubai v. Irish, 207
> Conn. 518, 532-33, 542 A.2d 711 (1988)].   (Internal quotation marks omitted).
> Elliott v. Waterbury, 245 Conn. 385, 415, 715 A.2d 27 (1998).

Shay v. Rossi, supra, at 181.

On this point, the court in Martin v. Brady, 261 Conn. 372, 802 A.2d 814 (2002) utilized

the following analysis in dismissing a complaint:

> We next consider the exception to the immunity provided in § 4-165, and assess
> whether the plaintiff has sufficiently alleged that the defendants' conduct was
> "wanton, reckless or malicious."  We conclude that it was not.  As we have
> observed, "[w]e have never definitively determined the meaning of wanton,
> reckless or malicious as used in § 4-165.  In the common-law context, however,
> we have stated:  In order to establish that the defendants' conduct was wanton,
> reckless, willful, intentional and malicious, the plaintiff must prove, on the part of
> the defendants, the existence of  a state of consciousness with reference to the
> consequences of one's acts...[Such conduct] is more than negligence, more than
> gross negligence...[I]n order to infer it, there must be something more than a
> failure to exercise a reasonable degree of watchfulness to avoid danger to others
> or to take reasonable precautions to avoid injury to them...It is such conduct as
> indicates a reckless disregard of the just rights or safety of others or of the
> consequences of the action...[In sum, such] conduct tends to take on the aspect of
> highly unreasonable conduct, involving an extreme departure from ordinary care,
> in a situation where a high degree of danger is apparent."  (Internal quotation
> marks omitted.) Id., 181.

Here, the defendants were acting within the scope of their employment, in an effort to keep

dangerous contraband out of a maximum security prison.  Their conduct was neither wanton,

reckless, nor malicious, but rather was undertaken in good faith to ensure the safety and security

of staff and inmates alike.  Under the allegations of the complaint, the defendants have statutory

immunity under §4-165.

    C.    The Court Should Abstain or Decline Supplemental Jurisdiction

In Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 85 L. Ed. 971, 61 S. Ct. 643

(1941), the Supreme Court held that federal courts should abstain from decision when difficult

and  unsettled  questions of  state law  must be resolved before a substantial federal constitutional

question can be decided.  Katz v. Stannard Beach Association, No. 3:98cv851 (JBA), 95 F. Supp. 2d 90 (D.Conn. 2000).  Conn. Gen. Stat. §52-571b has never been interpreted by the Connecticut Supreme Court; indeed, it has never been definitively interpreted.  Therefore, the Court should abstain from interpreting an unsettled state statute.

Further, because the Court should dismiss each of the federal claims on which original jurisdiction could be based, as argued above, the Court should  exercise its discretion and decline to retain supplemental jurisdiction over plaintiff's state law claims arising under Conn. Gen. Stat. §52-571b.  Katz v. Stannard Beach Association, 95 F.Supp at 98; St. George v. Mak, 842 F. Supp. 625, 632 (D.Conn. 1993).

## CONCLUSION

For all the foregoing reasons, plaintiff's amended complaint fails to state a claim and/or seeks monetary relief from defendants who are immune from such relief and thus, the defendants' motion to dismiss should be granted.

DEFENDANTS
John J. Armstrong, Et Al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:     ___/s/_____

Steven R. Strom
Assistant Attorney General
Mackenzie Hall
110 Sherman Street
Hartford, CT 06105
Tel.:  (860) 808-5450
Fax:  (860) 808-5591
E-mail:  steven.strom@po.state.ct.us
Federal Bar No.  ct01211

## CERTIFICATION

I hereby certify that the foregoing Memorandum in Support of Motion to Dismiss was

mailed this 31th day of March 2004 to:

John Allen, VADOC # 287059
Red Onion State Prison
P.O. Box 1900
Pound, VA 24279

___/s/_____

Steven R. Strom
Assistant Attorney General

40