UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


JOHN ALLEN                    :
                             :            PRISONER
     v.                       :  CASE NO. 3:02CV1818(DJS)(TPS)
                             :
JOHN ARMSTRONG, et al.[1]      :


RULING AND ORDER

Plaintiff John Allen is a Hawaii-sentenced inmate currently confined at the Red Onion State Prison in Pound, Virginia. He brings this civil rights action pro se pursuant to 28 U.S.C. § 1915. The plaintiff alleges that he was denied his First Amendment right of practice his religion when the defendants denied his requests to wear religious headgear and to acquire other religious items and literature. Pending is a motion to dismiss filed by the defendants. For the reasons that follow, the defendants' motion is granted in part and denied in part.

I.    Standard of Review

When considering a Rule 12(b) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most

_____

[1]The named defendants are John Armstrong, Jack Tokarz, Anthony Bruno, Fred Levesque, Giovanny Gomez, Larry Myers, Brian Murphy, Mark Strange, James Huckabey, Mark Allen, Rene Kieda, Thomas Coates, Neal Kearney, Michael LaJoie, Captain Cleaver, Corrections Treatment Officer Mahoney, Corrections Treatment Officer Vadnais, Correctional Officer Hernandez, Correctional Officer Allison, Correctional Officer Fernandez and Robyn DiGennaro.

favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Thomas v. City of N.Y., 143 F.3d 31, 37 (2d Cir. 1998).  Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted.  See Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000); Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).  "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." Branham v. Meachum, 77 F.3d 626, 628 (2d Cir. 1996) (quoting Grant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995) (internal quotations omitted).  In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).  The Second Circuit "ordinarily require[s] the district courts to give substantial leeway to pro se litigants." Gomes v. Avco Corp., 964 F.2d 1330, 1335 (2d Cir. 1992).

II.  Facts

The court accepts as true the following facts taken from the amended complaint and the documents attached as exhibits to plaintiff's motion for more definite statement [doc. #33] and affidavit in support of motion for more definite statement [doc.

2

#32].  The documents are referenced in the plaintiff's amended complaint.

The plaintiff is a Hawaii-sentenced inmate who was incarcerated in Connecticut from November 15, 1996 through November 1, 2000 pursuant to an Interstate Corrections Compact. In 1996, the plaintiff was a practicing Native American and was a member of the People of the Red Tail Alliance and a member of the Pan American Indian Association.

Upon his arrival at Northern Correctional Institution ("Northern"), prison officials confiscated his religious headgear and medicine bag.  In November and December 1996, the plaintiff submitted inmate requests for a spiritual advisor and the return of his religious headgear and medicine bag.  Prison officials did return plaintiff's medicine bag, but they did not respond to plaintiff' request for the return of his religious headgear. The Catholic Chaplain at Northern advised the plaintiff that a Native American advisor would be coming to Northern in April 1999.  A Native American Chaplain, defendant Mark Allen, arrived at Northern in April 1999 and visited with the plaintiff on April 14, 1999.

The plaintiff requested that defendant Allen facilitate the return his religious headgear.  On April 15, 1999, the plaintiff submitted a request for the religious headgear to defendant Myers.  On June 16, 1999, defendant Allen advised the plaintiff

that he was in the process of discussing the request for the return of the religious headgear with the plaintiff's unit manager.

In June 1999, the plaintiff submitted a request to defendant Kearney, his Unit Manager, seeking approval to obtain and wear religious headgear.  Defendant Kearney denied the plaintiff's request on July 20, 1999, due to safety concerns, but noted that the policy was being reviewed by defendant Bruno, the Director of Religious Services.  On August 23, 1999, defendant Murphy responded to plaintiff's appeal of a denial of a grievance concerning the use of the headgear.  He informed the plaintiff that defendant Myers had approved the plaintiff's request for the return of the religious headgear, but had determined that the headgear could only be worn in the plaintiff's cell.  Defendant Murphy also informed the plaintiff that the issue of whether the headgear could be worn outside of the plaintiff's cell was under review.

In August 1999, the plaintiff submitted requests and grievances to defendants Myers and Allen concerning his desire to wear the headgear outside of his cell.  Defendants Myers and Murphy informed the plaintiff that the issue was still under review by the defendant Bruno.  On August 3, 1999, defendant Bruno informed the plaintiff that the policy regarding Native American headgear was still under review.

4

On December 3, 1999, the plaintiff was transferred to MacDougall Correctional Institution ("MacDougall").  He sent a request to defendant Cleaver seeking to wear his religious headgear outside of his cell and to participate in the smudging ceremony.  On December 8, 1999, the plaintiff received the necessary items to participate in the smudging ceremony.  The plaintiff claims that he received verbal approval to wear the religious headgear in the housing unit and in the recreation areas, but was denied the opportunity to participate in the smudging ceremony.  In response to a second request to wear religious headgear at all times, defendant Keida responded that the Religious Services Department was still reviewing the issue.

On December 21, 1999, the plaintiff submitted multiple requests for permission to acquire ceremonial gemstones from a Native American religious organization.  A prison official informed the plaintiff that he might purchase the gemstones via mail if he received approval from defendant Tokarz.  Defendants Bruno and Tokarz responded to the plaintiff's request and informed him that he was not authorized to purchase gemstones and directed the plaintiff to contact the Native American Elders regarding other items which might be suitable for his medicine bag.  Defendant Strange denied plaintiff's grievance and the defendant Huckabey denied the appeal of the grievance on this issue.

5

On January 10, 2000, the plaintiff requested that he be permitted to acquire a totem fetish in the shape of a bear and a black bear tooth or claw. Defendant Tokarz informed the plaintiff that selected items for the plaintiff's medicine bag would be available from the commissary soon. He also directed the plaintiff to see defendant Allen regarding appropriate items for his medicine bag until the items were available in the commissary.

The plaintiff filed a grievance concerning the failure of officials at Northern to forward correspondence and religious literature to him at MacDougall. In response to plaintiff's grievance defendant Huckabey informed the plaintiff that under Department of Correction Directives, the Department was not responsible for forwarding general correspondence to an inmate transferred to another facility. On January 18, 2000, the plaintiff received his personal property from Northern consisting of four religious headbands. Defendant Hernandez retained the headbands as items that were not authorized to remain in plaintiff's possession. Defendant Strange affirmed the retention of the headbands as being unauthorized items of property.

Prison officials at MacDougall placed the plaintiff in the restrictive housing unit on January 22, 2000. The plaintiff claimed that prison officials confiscated his religious headband and a sweatshirt upon his transfer to the restrictive housing

unit.  Defendant Strange responded that no such items were
confiscated from the plaintiff.

On January 31, 2000, the plaintiff submitted a request for
permission to acquire a black bearskin prayer rug to use in the
smudging ceremony.  on February 1, 2000, the plaintiff was
transferred back to Northern.

Defendant Tokarz denied the plaintiff's request for the
prayer rug and indicated that the rug did not have to be made of
animal skin and directed the plaintiff to contact defendant Allen
regarding his request for a prayer rug.  Defendant Myers denied
plaintiff's grievance.

The plaintiff received his property from MacDougall on
February 4, 2000, and noticed that his medicine bag was ripped.
Defendant Myers rejected his grievance concerning the damage to
the medicine bag because the plaintiff has failed to try to
informally resolve the issue.  Defendant Murphy denied the appeal
of the grievance.

On February 7, 2000, the plaintiff filed a grievance seeking
to wear his religious headband outside of his cell.  Defendant
Myers denied plaintiff's grievance and defendant Murphy denied
the appeal.  In March 2000, the plaintiff submitted requests for
ermine, fox or rabbit hides and a peace pipe.  On March 27, 2000,
defendant Tokarz responded that religious headbands would be
available in the commissary in the very near future, animal hides

7

were not authorized and inmates were not authorized to have pipes.

The plaintiff signed an individual smudging agreement on February 17, 2000, and received his smudging items on March 23, 2000.  The plaintiff claimed that the cedar and sage items were missing from the materials.  Defendant Allen refused to replace these items and informed the plaintiff that he must purchase his own supply.  He also informed the plaintiff that the smudging agreement prohibited the plaintiff from receiving donations of religious items.

On March 14, 2000, defendants Myers and DiGennaro placed the plaintiff on grievance restriction due to his excessive filing of grievances over the course of one week and abuse of the grievance procedure.  This status precluded him from filing more than one grievance per month.  Thus, defendant DiGennaro rejected the plaintiff's three grievances submitted on May 1, 2000 and one grievance submitted on May 3, 2000.

On April 15, 2000, a religious organization informed the plaintiff that in January 2000, it had sent three gemstones to defendant Keida for the plaintiff's use.  Defendant Keida denied ever receiving the stones.

On May 14, 2000, a Lieutenant placed the plaintiff on in-cell restraint status on May 14, 2000.  Defendants Allison and Fernandez confiscated plaintiff's personal property.  On May 16,

8

2000, plaintiff noticed five religious books missing from the
property inventory.  The plaintiff filed grievances concerning
the missing books.  Defendant DiGennaro rejected the three
grievances submitted by the plaintiff because he was still on
grievance restriction status.

In July 2000, the plaintiff submitted a request to defendant
Myers to have his racial heritage data changed by the
classification department.  On August 16, 2000, defendant
Levesque informed the plaintiff that the Connecticut Department
of Correction would list his race as black because the Hawaii
Department of Public Safety listed his race as black.  He also
informed the plaintiff that he should contact the Hawaii
Department of Public Safety if he had any questions about the
issue.

On August 16, 2000 and September 5, 2000, the plaintiff
submitted a request to have defendant Allen donate a religious
headband to him.  Defendant Tokarz responded to the plaintiff's
requests and informed the plaintiff that religious headbands were
available for purchase in the commissary and that Department of
Correction policy now permitted an inmate to wear religious
headgear at all times.  Defendant Tokarz also informed the
plaintiff that after he purchased the religious headband, the
Native American Chaplain could bless it and then gift it to him.
Further, the current policy regarding the donation of smudging

materials by volunteer Elders did not apply to headbands.

III.  <u>Discussion</u>

The defendants move to dismiss this action on eleven grounds.  They argue that: (1) the claims against them in their official capacities are barred by the Eleventh Amendment, (2) the claims for declaratory and injunctive relief are moot, (3) the plaintiff has failed to exhaust his administrative remedies as to all claims, (4) some of plaintiff's claims are time-barred, (5) the allegations of lost property fail to state a claim upon which relief may be granted, (6) the claim for damages is barred by 42 U.S.C. 1997e(e), (7) the claims under the Religious Land Use and Institutionalized Persons Act are barred by sovereign immunity, (8) the action is barred by the doctrine of res judicata and/or collateral estoppel, (9) they have not violated plaintiff's First Amendment claims, (10) the defendants are protected by qualified immunity and (11) the plaintiff's state law claims are barred by the doctrines of sovereign and statutory immunity.

A.    <u>Eleventh Amendment Immunity</u>

The defendants first argue that all claims for damages against them in their official capacities are barred by the Eleventh Amendment.  The plaintiff does not address this argument.

Generally, a suit for recovery of money may not be maintained against the state itself, or against any agency or

department of the state, unless the state has waived its
sovereign immunity under the Eleventh Amendment.  <u>See</u> <u>Florida</u>
<u>Dep't of State v. Treasure Salvors</u>, 458 U.S. 670, 684 (1982).
Section 1983 does not override a state's Eleventh Amendment
immunity.  <u>See</u> <u>Quern v. Jordan</u>, 440 U.S. 332, 342 (1979).  The
Eleventh Amendment immunity which protects the state from suits
for monetary relief also protects state officials sued for
damages in their official capacity.  <u>See</u> <u>Kentucky v. Graham</u>, 473
U.S. 159 (1985).  A suit against a defendant in his official
capacity is ultimately a suit against the state if any recovery
would be expended from the public treasury.  <u>See</u> <u>Pennhurst State</u>
<u>Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 101 n.11 (1984).

The plaintiff filed this action pursuant to 42 U.S.C. 1983
claiming the defendants violated his First Amendment rights.  To
the extent that he seeks damages from the defendants in their
official capacities, such claims are barred by the Eleventh
Amendment.

The plaintiff also includes state law claims against the
defendants in his amended complaint.  The Eleventh Amendment bars
federal suits against state officials on the basis of state law.
<u>See</u> <u>Pennhurst</u>, 465 U.S. at 121; <u>Young v. New York City Transit</u>
<u>Authority</u>, 903 F.2d 146, 164 (2d Cir.), <u>cert. denied</u>, 498 U.S.
984 (1990).  "[T]his principle applies as well to state law
claims brought into federal court under pendent jurisdiction."

Pennhurst, 465 U.S. at 121.  Thus, defendants' motion to dismiss is granted as to both federal and state law claims for money damages against the defendants in their official capacities.

B.   Claims for Declaratory Relief

The plaintiff also seeks declaratory relief from the defendants in their official capacities.  The defendants argue that this relief is moot because the plaintiff no longer is confined in a Connecticut correctional institution.

The Second Circuit has held that an inmate's request for declaratory and injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is discharged or transferred to a different correctional institution.  See Thompson v. Carter, 284 F.3d 411, 415 (2d Cir. 2002) (holding that "[a] prisoner's transfer to a different correctional facility generally moots his request for injunctive relief against employees of the transferor facility" and affirming district court's dismissal of claims for prospective injunctive and declaratory relief against defendants from transferor facility) citing Prins v. Coughlin, 76 F.3d 504, (2d Cir. 1996)); Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed").  Other courts concur with this result.  See, e.g., Martin v. Sargent, 780 F.2d

1334, 1337 (8th Cir. 1985) (holding that inmate's claims for injunctive and declaratory relief concerning prison conditions were moot where prisoner had been moved to another prison unit).

The plaintiff, who is a Hawaii-sentenced inmate, has been transferred to a Virginia correctional facility.  Thus, all claims for declaratory and injunctive relief are moot.  The defendants' motion to dismiss is granted as to all claims for declaratory relief.  All claims for relief against the defendants in their official capacities have been dismissed.

C.    Exhaustion of Administrative Remedies

The defendants argue that the plaintiff has not fully exhausted his administrative remedies with regard to all claims for relief because he has not attached Level 1, Level II or Level III grievance forms to his amended complaint.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), requires an inmate to exhaust "administrative remedies as are available" before bringing an "action . . . with respect to prison conditions."  The Supreme Court has held that this provision requires an inmate to exhaust administrative remedies before filing any type of action in federal court, see Porter v. Nussle, 534 U.S. 516, 122 S. Ct. 983, 992 (2002), regardless of whether the inmate may obtain the specific relief he desires through the administrative process.  See Booth v. Churner, 532 U.S. 731, 741 (2001).

13

The Second Circuit considers the failure to exhaust administrative remedies an affirmative defense. "A defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements [that plaintiff first exhaust all administrative remedies]." Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999). By characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss. Rather, the defendants must present proof of non-exhaustion. See also Reyes v. Punzal, 206 F. Supp. 2d 431, 433 (W.D.N.Y. 2002) ("in the Second Circuit, failure to comply with the PLRA's exhaustion requirement is viewed as an affirmative defense . . . and . . . defendant bears the burden of proving plaintiff's failure to comply with the exhaustion requirement")(citations omitted); Hallett v. New York State Dep't of Correctional Serv., 109 F. Supp. 2d 190, 196-97 (S.D.N.Y. 2000) (same).

Although the plaintiff did not attach the inmate request forms and Level I, II, and III grievance forms to his amended complaint, those documents are referenced in the amended complaint and are attached to the plaintiff's motion for more definite statement and affidavit [docs. ## 32, 33]. The court deems those documents incorporated into the amended complaint by reference. It is evident from those documents that the plaintiff

in fact grieved many if not all of his various claims concerning denial of various religious items and loss or destruction of personal property.  The documents also reflect that in March 2000, the Grievance Coordinator at Northern, defendant DiGennaro placed the plaintiff on grievance restriction.  The plaintiff remained on grievance restriction status until at least the end of May 2000.  Thus, during that time period the plaintiff could not exhaust his administrative remedies.  The defendants have not provided any evidence that the plaintiff has failed to exhaust his administrative remedies as to the claims in the amended complaint.  Accordingly, the motion to dismiss is denied on this ground.

      D.   <u>Statute of Limitations</u>

The defendants argue that the plaintiff's allegations concerning incidents that occurred before October 1999, are barred by the statute of limitations.  The plaintiff does not address this argument.

In Connecticut, the general three-year personal injury statute of limitations period set forth in Connecticut General Statutes § 52-577 has been uniformly found to be the appropriate one for federal civil rights actions.  <u>See</u> <u>Lounsbury v. Jeffries</u>, 25 F.3d 131, 134 (2d Cir. 1994) (applying Connecticut's three year statute of limitations to actions brought pursuant to 42 U.S.C. § 1983); <u>In re State Police Litigation</u>, 888 F. Supp. 1235,

1248-49 (D. Conn. 1995) (same).

Here, the plaintiff filed this action on October 8, 2002.[2]
All of the allegations concerning his confinement at Northern
during the period from November 1996 until the end of September
1999 occurred more than three years before the filing of the
instant complaint.  Furthermore, the plaintiff has alleged no
applicable tolling provisions.  Thus, the claims against the
defendants regarding incidents that occurred between November
1996 and the end of September 1999 are barred by the statute of
limitations.  The motion to dismiss is granted as to those claims
on statute of limitations grounds.

    E.    Property Claims

The plaintiff's amended complaint includes various claims
that the defendants lost or destroyed items of his personal
property, including religious headbands, gemstones and a medicine
bag.  The defendants argue that plaintiff's allegations that they
lost or stole items of his personal property fail to state a
claim upon which relief may be granted.

The Supreme Court has found that the Due Process Clause is
not violated where a prison inmate loses personal belongings due

---

[2]Prisoners are deemed to have filed a complaint on the day
they give the complaint to prison officials to be mailed to the
court.  See Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993)
(citing Houston v. Lack, 487 U.S. 266, 270 (1988)).  The court
assumes that the plaintiff handed the complaint to prison
officials the date he signed his application to proceed in forma
pauperis.  The plaintiff signed his application on October 8,
2002.

to the negligent or intentional actions of correctional officers,
if the state provides an adequate post-deprivation compensatory
remedy.  Hudson v. Palmer, 468 U.S. 517, 531 (1984); Parratt v.
Taylor, 451 U.S. 527, 543 (1981).  The State of Connecticut
provides an adequate remedy for the kind of deprivation the
plaintiff sets forth.  See Conn. Gen. Stat. § 4-141 et seq.  This
state remedy is not rendered inadequate simply because the
plaintiff anticipates a more favorable remedy under the federal
system or that it may take a longer time under the state system
before his case is resolved.  See Hudson v. Palmer, 468 U.S. at
535.  Thus, it is not enough for the plaintiff to show that his
property was destroyed.  He must also show that he has been
denied due process of law, i.e., that he was denied an
opportunity to attempt to redress this alleged wrong through
legal procedures.  See Aziz Zarif Shabazz v. Pico, 994 F. Supp.
460, 473 (S.D.N.Y. 1998).

Because the plaintiff has an adequate remedy for the
negligent or intentional deprivation of his property under
Connecticut law, the plaintiff has not been deprived of property
without due process of law.  Thus, the plaintiff's Fourteenth
Amendment claim fails to state a claim upon which relief may be
granted.  See Aziz Zarif Shabazz, 994 F. Supp. at 473 (where
state law provides adequate remedy, claims for loss of personal
property not cognizable under section 1983).  The motion to

dismiss is granted on this ground as to all of plaintiff's property claims.

    F.   <u>Claims Under 42 U.S.C. 1997e(e)</u>

The defendants next argue that the plaintiff's First Amendment claims must be dismissed because he suffered no physical harm as a result of the alleged failure to provide him with various religious items.

The Prison Litigation Reform Act imposes a physical injury requirement on prisoner claims for mental or emotional injury. Specifically, the statute provides: "No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Second Circuit has held that this provision applies to claims for compensatory damages only. It does not apply to claims for nominal or punitive damages. <u>See Thompson v. Carter</u>, 284 F.3d 411, 417-18 (2d Cir. 2002).

Nowhere in the amended complaint does the plaintiff allege any facts suggesting that he suffered any physical injury as result of the defendants failure to provide him various religious items, literature or the opportunity to participate in a smudging ceremony. Thus, he fails to satisfy the requirement set forth in section 1997e(e). The defendants' motion to dismiss is granted as to the plaintiff's First Amendment claims for compensatory

damages.  The First Amendment claims for punitive damages remain.

G.    Claims Under the Religious Land Use and
      Institutionalized Persons Act

The plaintiff brings this action pursuant to 42 U.S.C. §
1983 and the Religious Land Use and Institutionalized Persons Act
of 2000 ("RLUIPA").  Under RLUIPA, state action that
"substantially burden[s] . . . the religious exercise of a person
residing in or confined to an institution" must be justified as
the "least restrictive means" of furthering a "compelling
governmental interest."  42 U.S.C. §§ 2000cc(a)(1), 2000cc-1(a).
The defendants contend that the Act does not create a cause of
action for money damages, but rather an inmate may only seek
injunctive relief against a state government.

RLUIPA was enacted on September 22, 2000.  The plaintiff's
allegations relate to a time period from October 1999 to
September 15, 2000.  RLUIPA does not contain language concerning
its retroactive applicability.  Other Courts have held that "to
apply [RLUIPA] retroactively and award damages for acts predating
enactment would violate longstanding judicial default rules."
Orafan v. Goord, No. 00CV2022 (LEK/RFT), 2003 WL 21972735, at *8
(N.D.N.Y. Aug. 11, 2003); see also Cancer v. Mazzuca, No. 01 Civ.
3129(NRB), 2003 WL 1702011 (S.D.N.Y. 2003) (permitting "plaintiff
to assert a claim for monetary damages under RLUIPA against Imam
Umar would violate the 'traditional presumption' prohibiting
retroactive application of statutes.")  The court agrees with the

19

other courts in this circuit holding that RLUIPA may not be
applied retroactively to claims for monetary damages that predate
its enactment.  The motion to dismiss is granted as to the
plaintiff's RLUIPA claims.[3]

    H.   Res Judicata/Collateral Estoppel

_____The defendants contend that the plaintiff's claim that
defendants DiGennaro and Myers placed him on grievance
restriction is barred by the doctrines of res judicata and/or
collateral estoppel.  The plaintiff does not address this claim.

    In Connecticut, the doctrine of collateral estoppel or issue
preclusion bars a party from relitigating issues that were fully
and fairly litigated in a prior action.  See Aetna Casualty &
Surety Co. v. Jones, 220 Conn. 285, 302, 596 A.2d 414, 423-24
(1991).  An issue was fully and fairly litigated where the issue
was "properly raised in the pleadings, submitted for
determination, and in fact determined."  Scalzo v. Danbury, 224
Conn. 124, 128, 617 A.2d 440, 442 (1992).  In addition, there
must not have been any procedural limitations in the original
action which would have precluded a full and fair opportunity to
litigate the issue.

    The doctrine of collateral estoppel may be invoked by one

---

    [3]  The court does not construe the plaintiff's claim as
brought under RFRA, the Religious Freedom Restoration Act,
because the Supreme Court struck down RFRA as unconstitutional in
June 1997.  See City of Boerne v. Flores, 521 U.S. 507 (1997).
The court has already dismissed the plaintiff's claims regarding
incidents that occurred in 1996 and 1997.

who was not a party to the original action.  The only requirement
is that the party against whom the doctrine is applied, must have
had the opportunity to litigate the merits of the issue in the
prior action.  See Blonder-Tongue Laboratories, Inc. v.
University of Illinois Foundation, 402 U.S. 313, 329 (1971).  The
court is not required to permit "repeated litigation of the same
issue as long as the supply of unrelated defendants holds out."
Id.  Similarly, Connecticut has also abandoned the mutuality of
parties requirement for collateral estoppel.  Aetna Casualty &
Surety, 220 Conn. at 303, 596 A.2d at 424.

     The defendants argue that the plaintiff raised a similar
claim in another case filed in 2000 in this court, Allen v.
Armstrong, Case no. 3:00cv1823 (DJS), and that the court decided
the claim on the merits.  In that case, plaintiff claimed that
the defendants failure to comply with time limits for processing
grievances and their decision to place him on grievance
restriction impeded his access to courts.  See Allen v.
Armstrong, Case no. 3:00cv1823 (DJS), slip op. at 16-17 (D. Conn.
Aug. 8, 2003).  The court has reviewed the amended complaint in
this action and does not find that the plaintiff raises a claim
that his placement on abuse of grievance status prevented him
from exhausting his administrative remedies and filing an action
in federal court.  Here, the plaintiff claims that his placement
on grievance restriction interfered with his ability to practice

21

his religion because defendant DiGennaro refused to process his grievances concerning his requests for various religious items due to that restriction.

Defendants DiGennaro and Myers were defendants in the prior action.  In addition, the plaintiff could have raised his claim concerning his placement on grievance restriction and the defendants' refusal to process his grievances in the prior action.  Thus, the court concludes that the plaintiff's claims that the decision of defendants Myers and DiGenarro to place him on grievance restriction and defendant DiGenarro's refusal to process his grievances due to that restriction are barred by the doctrine of collateral estoppel.  The motion to dismiss is granted on this ground.  All claims against defendant DiGennaro are dismissed.

I.   First Amendment Claims

The plaintiff argues that the actions of the defendants in denying his requests for various religious items, failing to provide him with religious literature and books, denying him the opportunity to participate in the smudging ceremony and failing to change his prison records to reflect his multi-racial heritage violated his First Amendment right to practice his Native American religion.  The defendants contend that they did not violate the plaintiff's First Amendment rights.

"A prisoner does not shed . . . basic First Amendment rights

at the prison gate.  Rather he 'retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law.'"  Procunier v. Martinez, 416 U.S. 396, 422-23 (1974) (citation omitted).  An inmate retains the right to freely exercise his religious beliefs and is entitled to reasonable religious accommodations by prison officials.  See Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997).  Even First Amendment rights, however, may be limited by legitimate penological needs.  See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977). When reviewing policies, decisions or regulations alleged to infringe on an inmate's First Amendment rights, the court applies a reasonableness standard.  A decision, policy or regulation is valid if it is reasonably related to legitimate penological concerns.  See Turner v. Safley, 482 U.S. 78, 89 (1987); O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987).  The right of prison officials to infringe on inmates' First Amendment rights must be "evaluated in light of the central objective of prison administration, safeguarding prison security."  Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Here, the defendants argue that the decisions to deny plaintiff's requests to wear his religious headband at all times, to possess ceremonial gemstones, a totem fetish, black bear tooth or claw, bearskin prayer rug, ermine, fox or rabbit hides and a

23

peace pipe, to participate in a smudging ceremony at MacDougall, to require him to buy religious items at the commissary and to prohibit him from receiving donated religious items were reasonably related to legitimate penological objectives.  The defendants attach State of Connecticut Department of Correction Directives governing Inmate Property 6.10, Religious Services 10.8 and Commissary 3.8 to their memorandum in support of the motion to dismiss and state that the plaintiff's demand for various religious items jeopardized safety and security by draining staff resources and creating groups that would challenge prison officials' authority.  Administrative Directive 6.10 provides that religious articles may be purchased from the commissary and that items not available in the commissary may be purchased via mail with the permission of the Deputy Commissioner of Programs.  Admin. Dir. 6.10(15).

It is not evident from the documents referenced in the plaintiff's amended complaint that the defendants denied the plaintiff's requests for various religious items because of safety and security concerns.  Most of the responses to plaintiff's requests by prison officials simply stated that the items are unauthorized.  At other times, prison officials would deny plaintiff's requests due to security concerns, but would not identify those concerns.

The court cannot conclude that the plaintiff will not be

24

able to present evidence in support of his First Amendment
claims.  Thus, the motion to dismiss is denied as to plaintiff's
allegations that the defendants violated the plaintiff's First
Amendment rights when they denied his requests for various
religious items, failed to provide him with religious literature
and books, denied him the opportunity to participate in the
smudging ceremony and failed to change his prison records to
reflect his multi-racial heritage absent legitimate penological
or safety concerns.

    J.   <u>Qualified Immunity</u>

The defendants argue that they are protected by qualified
immunity.  The plaintiff does not address this claim.

The doctrine of qualified immunity "shields government
officials from liability for damages on account of their
performance of discretionary official functions 'insofar as their
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.'"  <u>Rodriguez v. Phillips</u>, 66 F.3d 470, 475 (2d Cir. 1995)
(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  To
determine whether qualified immunity is warranted, the court
first must address the question: "Taken in the light most
favorable to the party asserting the injury, do the facts alleged
show the officer's conduct violated a constitutional right?"
<u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

> [I]f a violation could be made out on a
> favorable view of the parties' submissions,
> the next, sequential step is to ask whether
> the right was clearly established.  This
> inquiry, it is vital to note, must be
> undertaken in light of the specific context
> of the case, not as a broad general
> proposition.

Id.

At the time of the alleged violations of the plaintiff's rights, the law regarding claims for violations of First Amendment rights to practice religion had been established by Supreme Court precedent and interpreted by the courts for over ten years.  See Turner, 482 U.S. at 89; O'Lone, 482 U.S. at 349. The court has determined above that it cannot conclude at this stage of litigation that the plaintiff would not be able to state a claim for denial of his First Amendment right to practice his Native American religion.  Thus, the court cannot determine whether there has been a constitutional violation, the first step in evaluating a claim of qualified immunity.

Defendants' motion to dismiss is denied without prejudice on this ground.  Defendants may revisit this issue in a motion for summary judgment or at trial.

K.   State Law Claims

The plaintiff alleges that the defendants violated Connecticut General Statutes 52-571b, the Connecticut Act Concerning Religious Freedom.  The defendants argue that the doctrines of sovereign and statutory immunity bar the plaintiff's

26

state law claims against them in their individual capacities. The
plaintiff does not respond to this argument.

The doctrine of sovereign immunity "protects state officials
and employees from lawsuits resulting from the performance of
their duty ... and protects the state against lawsuits as well as
protecting against liability." Hultman v. Blumenthal, 67 Conn.
App. 613, 620, 787 A.2d 666, 672-73, cert. denied, 259 Conn. 929,
793 A.2d 253 (2002). Sovereign immunity bars actions against the
state or against state employees in their official capacities,
but does not bar actions against state employees in their
individual capacities. See Miller v. Egan, 265 Conn. 301, 307,
828 A.2d 549, 555 (2003) ("If the plaintiff's complaint
reasonably may be construed to bring claims against the
defendants in their individual capacities, then sovereign
immunity would not bar those claims.")

Under Conn. Gen. Stat. § 4-165, however, state officials and
employees who are sued in their individual capacities possess a
limited immunity from suit.  Under that statute, "[n]o state
officer or employee shall be personally liable for damage or
injury, not wanton, reckless or malicious, caused in the
discharge of his duties or within the scope of his employment."
Conn. Gen. Statu. § 4-165.  Thus, "[s]tate employees do not ...
have statutory immunity for wanton, reckless or malicious
actions, or for actions not performed within the scope of their

27

employment."   <u>Miller</u>, 265 Conn. at 319, 828 A.2d 549.


Here, the plaintiff has not alleged that the defendants acted wantonly, recklessly, maliciously or outside the scope of their official duties when they made decisions to deny his requests for various religious items and the opportunity to participate in the smudging ceremony at MacDougall.  Accordingly, the plaintiff's claims that the defendants violated his rights under the Connecticut Act Concerning Religious Freedom are barred by the statutory immunity provided by Conn. Gen. Stat. § 4-165. Accordingly, the motion to dismiss is granted as to the state law claim against the defendants in their individual capacities.

IV.  <u>Conclusion</u>

The Motion to Dismiss [**doc. #28**] is **GRANTED** as to all federal and state law claims for monetary damages and declaratory relief against the defendants in their official capacities, all state law claims against the defendants in their individual capacities, all claims concerning the loss, confiscation or destruction of plaintiff's property, all claims regarding incidents that occurred between November 1996 and the end of September 1999, all claims under RLUIPA, all claims for compensatory damages against the defendants in their individual capacities, all claims against defendant DiGennaro and the claim against defendant Myers concerning plaintiff's placement on

28

grievance restriction.  The Motion [**doc. #28**] is denied as to plaintiff's First Amendment claims against the defendants in their individual capacities for punitive damages.

**SO ORDERED** this ___6th___ day of April, 2005, at Hartford, Connecticut.

_____**/s/DJS**_____
Dominic J. Squatrito
United States District Judge